1 | **SAMPSON & ASSOCIATES**
Bryan D. Sampson, Esq. (#143143)
2 | 2139 First Avenue
San Diego, CA 92101
3 | (619) 557-9420 / Fax (619) 557-9425

4 | Attorneys for Creditor SARA NEWSOME BURNS

FILED
ENTERED
LODGED
RECEIVED

APR 13 2000

CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **SOUTHERN DISTRICT OF CALIFORNIA**

12 | In Re:                 )     **CASE NO.: 99-33191-B7**
                      )
13 |                       )     **DECLARATION OF BRYAN D.**
    SARA NEWSOME BURNS,     )     **SAMPSON IN SUPPORT OF MOTION**
14 |                       )     **OBJECTING TO DEBTOR'S**
                      )     **AMENDED EXEMPTION CLAIM**
15 |         Debtor.          )
                      )
16 |                       )     **Date:**     **05/30/00**
                      )     **Time:**     **11:00 a.m.**
17 |                       )     **Ctrm:**      **4**
                      )     **Hon. Peter w. Bowie**

19 | I, Bryan D. Sampson, declare:

20 | 1.    I am an attorney licensed to practice law in the State of

21 | California and before this Court. I am a principal of Sampson

22 | & Associates, attorneys of record for Creditor Bradley Proulx

23 | in the above-captioned action.

24 | 2.    If called upon to testify, I could and would competently

25 | testify to the matters contained herein based upon my personal

26 | knowledge.

27 | 3.    Attached hereto as Exhibit "1" is a true and correct copy of

28 | the State Court's Statement of Decision."

4.   Attached hereto as Exhibit "2" is a true and correct copy of the State Court judgment entered Debtor.

5.   Attached hereto as Exhibit "3" is a true and correct copy of excerpt's of Debtor's testimony in State Court.

6.   In the initial transaction between the parties, Creditor and Debtor entered into a 30% contingent fee contract wherein Creditor agreed to provide investigative services to Debtor to assist Debtor with a *"whistle blower"* claim she made against her employer.

7.   As a result of Creditor's services, Debtor prevailed in a *qui tam* action and was awarded $580,000. Unfortunately, she refused to pay anything to Creditor. Therefore, Creditor sued her and won a judgment for $231,462.61. (Exhibits "1 & 2.")

8.   Following entry of judgment, Creditor's trial counsel and I filed liens for Creditor and against Debtor, obtained a Restraining Order, obtained a Turnover Order for funds, filed an Assignment Motion, filed a lien on the federal court payment and deposed Debtor.

9.   In response, Debtor threatened bankruptcy and refused to deliver any records or funds. Instead, she attempted to receive payment from her federal *qui tam* claim without notice to Creditor by asking the government to expedite the final payment due in July to January of that year. I discovered her maneuver when I subpoenaed records, levied upon, obtained a restraining order and assignment order on the final $150,000 payment. The government counsel informed me at that time of Debtor's repeated, frantic calls for early payment.

2

1   10. Next, she filed a Chapter 13 Bankruptcy action to avoid the
2       state court actions. In the Chapter 13 action, upon my
3       request, the Court froze approximately $150,000 in cash
4       (subject to Creditor's State Court liens) held by the Debtor
5       which she initially did not disclose to the Court. In fact
6       the monies are still frozen pursuant to that Order.
7       Ultimately, the Chapter 13 was dismissed because Debtor did
8       not qualify due to too many unsecured creditor claims.

9   11. Debtor filed this Chapter 7 apparently to avoid Creditor's
10      claim. In the process, she objected to Creditor's lien on her
11      house and overstated amounts of two lien holders. Creditor
12      opposed the Objection and, after receiving discovery from
13      Debtor on the August 1999 lender statements, reduced the
14      priority liens.

15   12. Evidence supporting Creditor's belief that Debtor filed her
16      Amended Exemption claim in bad faith, and does not even
17      qualify for the increased exemption, is not entirely available
18      at this time. I am informed and believe and thereon allege
19      based upon my reasonable investigation, that Debtor is not
20      *"disabled",* under State and Federal law, because:
21      -  The Judgment involves her employment (Exhibit "1");
22      -  She admits in her deposition she works (Exhibit "3");
23      -  She is still working as a bookkeeper; and
24      -  She is employable as a bookkeeper.

25   13. Creditor's objection is timely filed since Debtor's amended
26      exemption was filed on March 13, 2000, even though it was not
27      received by Creditor until last week.

28

3

**EXHIBIT** "1"

**FILED**

'98 SEP 21 ?:

CLERK  . . . .
COURT ...

MUNICIPAL COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

SAN DIEGO JUDICIAL DISTRICT

| | |
|---|---|
| BRADLEY L. PROULX | CASE No. 00711064 |
| Plaintiff, | |
| vs. | STATEMENT OF DECISION |
| SARA NEWSOME BURNS, ET AL | |
| Defendant. | |

As a general rule, where there is a wrong, there is a remedy. [Civil Code §3523]. Under the False Claims Act at 31 U.S.C. 3730(f), contrary to defendants assertion, the U. S. "Government is not liable for expenses which a person incurs in bringing an action..." Therefore it is likely that neither the "original source" nor her "investigator" could have recovered costs or expenses for the investigation in any amount from the government. Clearly, not all claims to a share of the award in a False Claim *Qui Tam* action are cognizable only in federal court. [Marriage of Biddle, 52 Cal. App 4th 396 (1997)].

While the False Claims Act provides a basis for the "original source" to be rewarded with a percentage of the government's recovery,

1   it allows for reasonable costs and expenses of the private person
2   bringing the action to be recovered only from the person or entity
3   against whom the action is filed. This is a remedy available to the
4   *Qui Tam* plaintiff, not to his or her supplier of services. [31USC3730
5   d(1)]  Apparently the only remedy available directly to the *Qui Tam*
6   plaintiff's supplier of services is a remedy common to such persons in
7   most civil cases, namely, an action for breach of contract or to
8   enforce a lien, if there was one-which was not the case here.  The
9   defendant here could have recovered her reasonable costs and expenses,
10  possibly including her debt to plaintiff, if she had brought those to
11  the attention of the Court, but plaintiff had no legal standing to do
12  so.

13  **FOR THE FOREGOING REASONS, THE DEFENSE MOTION TO DISMISS FOR LACK**
14  **OF SUBJECT MATTER JURISDICTION DUE TO PREEMPTION IS DENIED.**

15  Having dealt with the jurisdictional issue, this Court must
16  determine if the plaintiff is entitled to recover on its contract
17  theories.  Plaintiff sues for breach of contract, or in the
18  alternative, for Quantum Merit.

19  To the question: "Was there an agreement between plaintiff and
20  defendants whereby plaintiff was to provide services to defendant in
21  exchange for a contingent monetary consideration?" The answer is a
22  resounding "yes".  Plaintiff testified to such an agreement in detail.
23  Defendant acknowledged that she signed an agreement, though no such
24  signed agreement is in evidence and defendant disputes the terms of
25  the original agreement.  There were several indications that defendant
26  believed there was an agreement, not the least of which was that she
27  claimed she called plaintiff and left a message firing him.  If she
28  ///

1  did not think he was hired or that she had some obligation to him,
2  then she hardly would have needed to fire him.

3      Establishing the terms of the agreement is not so simple.  It
4  should first be observed and the Court so finds, that plaintiff took
5  action at the request of defendant and with the reasonable expectation
6  that his efforts would be financially rewarded, contingent upon
7  defendant recovering something by reason of her claim and/or lawsuit
8  on behalf of the government.

9      For the most part, what was expected of the plaintiff is not much
10 in dispute.  The most significant dispute is what the defendant agreed
11 to pay the plaintiff for his services.

12     It was, without any dispute in the evidence, plaintiff's
13 responsibility to figure out how to go about pursuing a Qui Tam case
14 under the False Claims Act, guide defendant's actions in this regard,
15 facilitate the pursuit of the claim and do investigation in aid of
16 perfecting the False Claims Act recovery against the Qui Tam
17 defendants.

18     Defendant has several complaints or objections to plaintiff's
19 performance.  Principally defendant objects that the substantial fee
20 claimed by plaintiff is not justified by the work expected of him, or
21 actually performed by him.  However, this argument overlooks three key
22 points: (1)defendant apparently did not know how to capitalize on her
23 position other than being aware that there was a possibility of doing
24 so through some form of claim involving the government; (2)plaintiff
25 agreed to perform his work in return for a fee contingent upon
26 successfully perfecting defendant's claim-i.e., he took a significant
27 risk; witness the government's declining to take over the case-
28 ///

1  (3)defendant and her agents failed to utilize plaintiff or even keep
2  him informed.

3       The plaintiff visited government agencies, contacted several law
4  firms, and advised defendant how to proceed.  He introduced the
5  defendant to a highly respected, very competent law firm, which she
6  retained.  He conducted investigations and obtained valuable
7  information which was used by the attorneys who incorporated
8  information supplied by plaintiff in the complaint they filed for the
9  defendant on behalf of the government.  Plaintiff clearly performed
10 services of value to defendant.

11      Defendant complains that plaintiff did not do all that was
12 required under the agreement, and, in fact, abandoned the contract.
13 However, defendant also claims she "fired" plaintiff when he did not
14 appear for a meeting with government representatives.  Thereafter,
15 neither she nor her attorneys asked plaintiff to do anything.  When
16 she changed attorneys, she apparently deliberately kept plaintiff out
17 of the picture. If there was more for him to do, it was defendants
18 fault, not plaintiffs, that plaintiff did not perform further.  Rather
19 than abandoning the contract, it appears plaintiff continued to make
20 himself available, and bided his time while defendant rejected
21 plaintiff's services.

22      Defendant complains that plaintiff did not retain work papers and
23 "original" notes and that plaintiff's reports were somehow
24 insufficient.  However, there is no evidence as to how these alleged
25 deficiencies impeded defendants ultimate success.  In fact, it appears
26 that plaintiffs reports were helpful. As mentioned above they resulted
27 in significant allegations in the complaint and were relied upon by
28 defendant's attorneys who themselves seemed to have no complaints.  In

1  fact, subsequent attorneys she retained without plaintiff's assistance
2  testified that plaintiff's work was largely responsible for the
3  settlement which resulted in defendant's award.

4      Defendant also complained that plaintiff's efforts failed to
5  produce a principal object of their agreement-namely, that through
6  plaintiff's efforts they were to induce the U. S. Government to
7  intervene in the *Qui Tam*, action. While it is true that despite
8  plaintiff's efforts the government did not intervene, it cannot be
9  said that this was the principal object of the contract between
10  plaintiff and defendant. From the beginning the expressed principal
11  object of the agreement was to obtain a monetary award from the
12  proceeds of a *Qui Tam* action, which ultimately did occur and to which
13  end plaintiff contributed as stated above. There is no evidence that
14  the parties ever thought, let alone agreed, that if the government did
15  not intervene their agreement was terminated.

16      Defendant contended at trial that plaintiff refused to
17  participate in a meeting with the government which ostensibly was to
18  gather information for the purpose of aiding the government to decide
19  whether or not to intervene. However, the evidence adduced at trial
20  clearly shows that plaintiff's failure to participate in the meeting
21  was not a refusal and probably had absolutely no effect on the
22  government decision. The attorney for defendant who coordinated the
23  meeting so testified. The evidence also shows that the defendant
24  seriously over-reacted to the plaintiff's failure to participate in
25  the government meeting to the point of "firing" the plaintiff.

26      Defendant also argues that the subject agreement was against
27  public policy and was preformed with "unclean hands". First, it
28  should be noted that defendant was herself a party to the agreement

1 who stood to benefit from the alleged violation of public policy and
2 the allegedly illegal performance.  In fact, it was she who was
3 expecting plaintiff to testify and she herself did the same things she
4 claims the plaintiff did which were allegedly illegal.

5      While it may be undesirable, the defendant has not convinced the
6 Court that a witness giving testimony which may affect the witnesses
7 ability to get paid is so contrary to public policy that the witness
8 would be violating the canons of professional ethics or be barred from
9 giving testimony.  Certainly, such testimony would be subject to a
10 serious attack on its credibility, but it is quite common in Court.
11 Doctors whose ability to get paid on their liens may depend on the
12 testimony given, are frequently allowed to testify.  As a practical
13 matter, some experts who testify cannot reasonably expect to get fully
14 paid unless there is a recovery by plaintiff, although their retention
15 agreements may read otherwise.  Of course, the parties themselves
16 testify and they usually have a financial interest in the outcome.

17      All such testimony is permitted and may be evaluated by the trier
18 of fact in light of the "_bias, interest or other motive..." which
19 might influence testimony.  In this case, there was no evidence of the
20 existence of formal ethical standards for private investigators, only
21 the opinion of another investigator, unsubstantiated by any written
22 reference, formal pronouncements or decisions of ethics boards or
23 agencies.

24      Furthermore, seldom are investigators called upon to give
25 testimony in the trial of a matter.  Certainly the issue never
26 actually arose in this case or even came close.  Usually, the
27 investigator provides information concerning witnesses or documents
28 who are then called to testify or which are authenticated by means

1  unrelated to the investigator.  Only in a rare case is the
2  investigator called after other witnesses have testified to impeach,
3  or conceivably, but very rarely, if ever, to authenticate.  Insurance
4  claims investigators are occasionally called upon to do this even  .
5  though their employers' financial interests are at stake.  No one has
6  ever suggested that they cannot legally testify or that it would be
7  unethical for them to do so.

8      With regard to the allegedly illegal investigation methods, the
9  court will observe first that the type of information gathering done
10 by plaintiff here is common.  If done by a governmental agency, it is
11 possible that someone would conclude that the government conducted a
12 search without warrant or probable cause.  This work, however, was not
13 done by a governmental entity.  Whether it would constitute an
14 actionable invasion of privacy is debatable, but probably the only
15 persons with standing to make such a claim are the "patients" not the
16 institution nor the defendant.  It was alleged that the conduct of
17 plaintiff constituted theft, but there is no evidence that plaintiff
18 took anything physical or of intrinsic value that belonged to another.
19 He copied information and made notes.  Perhaps taking the paper upon
20 which the copies were made could be considered conversion, or even
21 petty theft, but this will not obviate the underlying agreement here.
22 Neither would illegal tape recording of non-parties words, though this
23 might be considered a violation of criminal statutes.  The evidence in
24 these areas is insufficient.

25      Plaintiff herself took copies of papers and records from her
26 employer.  For her to complain that the investigator she hired did
27 something similar and that this should be the basis of not paying him
28 for his services, smacks of inequity.  If he did wrong, let those with

1   a legitimate adverse interest in his alleged wrong-doing pursue the
2   matter, not someone with no such adverse interest who only wants to
3   avoid a debt.

4       Defendant asserts the statute of limitations and laches as a
5   defense.   The plaintiff filed the lawsuit well within 2 years after
6   defendant allegedly breached her agreement by failing to pay plaintiff
7   after she received her award from the government.  As defendant had no
8   plans to inform plaintiff of the occurrence of that event which
9   triggered her liability, that is receiving her reward from the
10  government, and as plaintiff appears to have timely filed this action
11  thereafter, neither the 2 year statute of limitations for breach of an
12  oral agreement or for quantum merit, nor laches, would seem to apply
13  here.

14      Determining the amount due plaintiff pursuant to agreement and
15  whether such an amount was unconscionable are bound up together.
16  Plaintiff claims that the original agreement was for 50% of the award
17  to defendant.   The Court does not trust the accuracy of defendant's
18  testimony which was inconsistent with this. It would be a substantial
19  portion of the award indeed, but generally the parties to a contract
20  are free to set their own terms without interference from the court
21  called upon to enforce the agreement.

22      Plaintiff claims that the amount of his contingent fee was later
23  modified in another oral agreement which he memorialized in writing.
24  Defendant denies that she ever received the letters setting forth the
25  agreement, but does not specifically deny that a conversation about
26  modifying the original agreement took place.   Since the modification
27  would reduce the amount to which plaintiff is entitled and would
28  ///

8

1  benefit defendant, plaintiff should be permitted to recover this
2  reduced amount.

3       Of course, there is a dispute regarding the interpretation of the
4  modification.  Defendant contends that the modification would entitle
5  plaintiff to 10% of the gross settlement of the government which, at
6  the outset could have appeared to exceed the possible recovery of
7  defendant.  Plaintiff testified that it was his understanding that
8  what the parties had actually meant to agree to was one-third (33%)
9  rather than the original 50%, and that the 10% figure represented one-
10 third of the 30% of gross which the parties hoped to receive as a
11 reward for their part in the *Qui Tam* case.  This is not obvious from
12 the language of the letter which plaintiff has offered as
13 corroboration of the modified agreement, but the more literal
14 interpretation proffered by defendant is indeed potentially
15 unconscionable, and could hardly have been consistent with an intent
16 to reduce the contingent obligation of the defendant.

17      Of course, once again, as things turned out even the literal
18 interpretation of the letter produces almost the same result which
19 plaintiff claims was the aim and intent of the modification.  It also
20 produces a result which is very close to the "original" agreement
21 defendant concedes she thought she entered into (30%).  As plaintiff
22 has offered an interpretation which reduces defendants obligation,
23 once again the court will accept that version of the agreement.

24      The criticisms of the hourly charges is based largely on
25 hindsight and does not reach all of the work performed by plaintiff.
26 Therefore, the Court will award the amount claimed as not
27 unreasonable.

28 ///

1    The court therefore awards plaintiff one-third (1/3) of the total

2    amount awarded to defendant by the U. S. Government, plus $22,267.50

3    together with interest thereon at the rate of 10% per annum, without

4    compounding.  The amount due plaintiff shall be paid at the rate

5    payment is made by the government to defendant.  As the evidence shows

6    that defendant has already received substantial payment, and as

7    interest is due on the hourly charges from the date defendant began to

8    receive payments and declined to pay plaintiff, the payment for hourly

9    fees and interest thereon shall be paid forthwith, together with an

10   amount equal to one-third (1/3) of the award already paid by the

11   government to defendant.  Plaintiff shall be entitled to costs of

12   suit.  Plaintiff shall prepare a judgement for signature by the court

13   and have it approved as to form by counsel for defendant.

14

15   Dated:  9/16/98

16                                         TIMOTHY W. POWER, JUDGE
                                          SAN DIEGO MUNICIPAL COURT
17

18

19

20

21                                    Date: SEP 17 1998

22                                    Attest: A true copy
                                      D. KENT PEDERSEN, Court Administrator
23                                    By                          Deputy

24

25

26

27

28

**EXHIBIT** "A"

E I L E D
KENNETH E. MARTONE
Clerk of the Superior Court

OCT 3 0 1998
MC ᶜʸ

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| BRADLEY PROULX, | CASE NO.   711064 |
| Plaintiff, | JUDGMENT |
| v. | The foregoing instrument is a full, true and correct copy of the original on file in this office. |
| SARA NEWSOME BURNS, | Attest: **JAN 1 3 1999** |
| Defendant. | **KENNETH E. MARTONE** Clerk of the Superior Court of the State of California, in and for the County of San Diego. |
| | By _____ Deputy |

This cause came on for hearing on June 15, 1998, in Department M-25 of the above-entitled court, the Honorable Timothy W. Tower, Judge, presiding.  Plaintiff appeared by his attorney T. Michael Reed, and defendant appeared by her attorneys David Tiffany and Randy Grossman.

Jury was waived.  Witnesses on the part of both plaintiffs and defendants were sworn and examined.  After hearing the evidence and the arguments of counsel, the court subsequently rendered a Statement of Decision as follows:  See Statement of Decision attached as Exhibit 1.

WHEREFORE, by virtue of law, and by reason of the premises aforesaid, it is ordered, adjudged, and decreed that plaintiff

1  BRADLEY PROULX has and recovers from defendant the sums as

2  follows:

3        One-third of $580,000.00 or $193,333.33 to be paid pro rata

4  as the government pays defendant, plus $22,267.50 together with

5  interest thereon from July 29, 1991 to the present at the rate

6  of 10% per annum, without compounding, in the amount of

7  $15,861.78.

8        Interest, costs and disbursements are to be determined.

9        WITNESS, the Honorable Timothy W. Tower, Judge of this

10  Court, and my hand and seal of this Court, this ___30^{TH}___ day of

11  ~~September,~~ *October* 1998.

12

13

14                              _Timothy W. Tower_____
                                HONORABLE TIMOTHY W. TOWER
15                              Sitting as Judge of the Superior
                                Court
16

17  Approved as to form:

18

19  _____

20  Attorneys for Defendant

21

22

23

24

25

26

27

28

EXHIBIT __"3"__

1          MS. HEINE:  Do you want to have this

2     discussion off the record?

3          MR. REED:  That's fine.  I just want her to

4     be comfortable.  Do you want to go off the record?

5          MS. HEINE:  Yes.

6          (Discussion off the record.)

7          MR. REED:  Go back on the record.

8     Q.    Now, we've gotten your name and we've learned

9     that your maiden name was Newsome.  When were you born?

10    A.    I was born on February 4th, 1958.

11    Q.    And when were you -- were you married to a

12    Burns at one time?

13    A.    Yes, I was.

14    Q.    Is that your only marriage?

15    A.    Yes, it is.

16    Q.    And what period of time did that entail?

17    A.    From 1988 until 1991.

18    Q.    Okay.  Just a divorce and that was the end of

19    it?

20    A.    Right.

21    Q.    Some of the questions I'm going to ask will

22    be background questions.  I don't mean to pry, and I'm not

23    interested in embarrassing you.  So let me know if I'm

24    delving into an area that you think is a problem, and we

25    can discuss it.

26          At any rate, I'm going to ask you, where do

27    you live?

28    A.    Where do I live?  I live in San Diego.

1     Q.    San Diego area?

2     A.    Yes.

3     Q.    What part of San Diego?

4     A.    I live in Kensington.

5     Q.    And what do you do for a living presently?

6     A.    I'm a student.

7     Q.    Where?

8     A.    San Diego State.

9     Q.    What do you study?

10    A.    Sociology.

11    Q.    How long have you been a student there?

12    A.    For five semesters.

13    Q.    Prior to that, what's the most current job

14 you've held?  Apparently, you're not employed at the

15 present, correct?

16    A.    I've -- I worked as a temp in 1994.

17    Q.    Who was that for?

18    A.    Claims Overload.

19    Q.    And did you get sent out to different

20 offices?

21    A.    I worked through the county and UCSD.

22    Q.    Who did you work for?  Who was your

23 employer?  Claims Overload?

24    A.    Claims Overload.

25    Q.    And how long did you work at that job?

26    A.    I worked at that job in between surgeries,

27 and that was for about four months.

28    Q.    And these were surgeries to do what?

8

1          A.     Hip replacements.

2          Q.     I notice you do have a cane and that, I take

3     it, has something to do with that?

4          A.     Right.

5          Q.     That, again, is probably none of our business

6     either, so we won't go any further into that.

7                 At some point in time, you met a Mr. Proulx,

8     P-r-o-u-l-x?

9          A.     Um-hum.

10         Q.     Yes?

11         A.     Yes.

12         Q.     Can you tell me when that happened?

13         A.     Yeah.  I met him about the end of July in

14    1990.

15         Q.     And what was the circumstances?  Was this a

16    social meeting or was this a business relationship or

17    what?

18         A.      I was in a car accident, and the attorney I

19    had at the time sent him out to interview me regarding the

20    accident.

21         Q.     Who was that attorney?

22         A.     David Beeson.

23         Q.     Did he work for Mr. Beeson then at that time?

24         A.      I guess so.

25         Q.     And did he come out to your house talk with

26    you?

27         A.     Yes.

28         Q.     And can you sort of take me on a

                                                              9

1          MS. HEINE:  Vague and ambiguous.

2   BY MR. REED:

3          Q.    That's okay.  You can still answer.

4          MS. HEINE:  When I object, you may still

5   answer the question.  I'm just preserving the objection

6   for the record.

7   BY MR. REED:

8          Q.    Just to let you know, what happens is that

9   she has a right to do that and she'll insert an objection

10  if she feels it's appropriate.

11         A.    Sure.

12         Q.    There's nobody here to rule on it.  Unless

13  she says to you, "Don't answer the question," because she

14  felt it's so improper that you shouldn't answer, you can

15  go ahead and answer.

16         A.    We developed this relationship, and he was

17  aware of the problems I was having while I worked at FPA.

18  And I ended up changing employers in October of '90, and I

19  told -- I was sharing with him the problems that was going

20  on there and that something needed to be done about it.

21         So he introduced me to Guillermo Marrero --

22         MS. HEINE:  You need to simply answer the

23  question he asks.  And when you've answered, just wait for

24  the next question.

25  BY MR. REED:

26         Q.    So you were working at FPA at some point in

27  time, then, right?

28         A.    Right.

11

```
 1          Q.    When did that begin, that job?

 2          A.    April of '90.

 3          Q.    And what was your job there?

 4          A.    I went through three positions there.

 5          Q.    What did you start out as?

 6          A.    I started off as a claims follow-up biller.

 7          Q.    And the next job?

 8          A.    I became the claims follow-up supervisor.

 9          Q.    And then?

10          A.    I became the business office manager of all

11   claims activity.

12          Q.    And about what point in time did you become

13   the manager?

14          A.    I would say it was about three months after I

15   was employed.

16          Q.    Around July of '90?

17          A.    (Witness nods head.)

18          Q.    Yes?

19          A.    Right.

20          Q.    When did you -- just to bracket the time

21   period, when did you cease being an employee of FPA?

22          A.    I quit in October -- by October of '90 or

23   around October of '90.

24          Q.    So you were only there about six months?

25          A.    Right.

26          Q.    And you said you quit.

27          A.    Yes, I did.

28          Q.    Why did you quit?
```

12

1    they billing Medicare for people they didn't serve?  Were

2    they stealing supplies or were they stealing drugs?

3          A.    It was basically a Medicare fraud case.

4          Q.    And they were billing --

5          A.    -- fraudulently to Medicare for inappropriate

6    treatments.

7          Q.    Treatments they weren't giving?

8          A.    Treatments they weren't giving and

9    overcharging patients.

10          Q.    How did you know that they were doing that?

11    I mean, how did you come to the knowledge about what the

12    charges should be versus what was being billed?

13          A.    It was my profession.

14          Q.    That was your job?

15          A.    (Witness nods head.)

16          Q.    Where did you learn that job?  At FPA or was

17    this prior work you had done?

18          A.    I have been in billing off and on before that

19    time for 12 years.

20          Q.    Would you run me through that real quickly

21    starting with your first job and just sort of run through

22    your times of who you worked for and when you worked for

23    them and what you did.

24          A.    I can.  It's going to be complicated because

25    I would go back and forth being a nurse and the business

26    office supervisor depending if I was having surgeries on

27    my hips or not.  So there was a lot of shifting of jobs.

28                Initially, I got my training at Carle

14

1      A.      Right.  I did the insuran.. claim, and I had

2   contacts in all aspects of insurance billing.

3              Then I was promoted to a new job that was

4   created, and that was where I was basically screening

5   patients on their income level and getting them connected

6   to various social service agencies.

7      Q.      Did you come into contact with Medicare in

8   that regard then?

9      A.      Yes, all the time.

10     Q.      So you were learning about Medicare along the

11  way?

12     A.      Well, yeah.  All along.

13     Q.      Sure.

14     A.      You know.  And then -- so then I worked as a

15  back-up cashier, so I learned all aspects of billing

16  within this hospital setting.

17     Q.      All right.

18     A.      Then I went back into nursing because I was

19  able to find a job that paid twice as much than what I was

20  being paid.

21     Q.      You're still in Illinois now?

22     A.      Right.

23     Q.      Okay.

24     A.      And it was in a nursing home situation.

25  About nine months after I worked there, and I would say

26  that was in '86, my hip went out again and I ended up

27  having to go to Boston for hip replacements.

28     Q.      Okay.

16

1    Foundation Hospital in Champaign, Illinois, which is a
2    very large hospital in the middle part of the state.
3        Q.    When you say training, are you talking about
4    nursing training?
5        A.    No.  I'm talking about business office
6    training.
7        Q.    Okay.  All right.
8        A.    I started off in the claims follow-up area,
9    collections, and their hospital was separated into the
10   cashier, insurance and collection departments.  When I --
11   it's been so long, I can't give you exact dates.  If
12   you --
13       Q.    I didn't think you could.  I couldn't either.
14   It's all right.
15       A.    Okay.  Thank you.  I left there.  Went to
16   nursing school.  Worked approximately a year as an LPN.
17       Q.    Did you graduate from a nursing school?
18       A.    Yes.  I got my license in 1981.
19       Q.    As a licensed professional nurse?
20       A.    Yeah.  Licensed practical nurse in the state
21   of Illinois.
22       Q.    Is that like an LVN here?
23       A.    Right.
24       Q.    Okay.
25       A.    And I worked approximately a year.  Then I
26   had to have hip replacements.  I went back -- I was hired
27   back at Carle Hospital for their insurance department --
28       Q.    Billing?

15

1    for Blunt, Keiller and Harbach.  I worked for Dr. Masters.

2         Q.    So eventually -- well, you worked there a

3    couple of years.  That brings us to about '90.  And then

4    did you have another job between that --

5         A.    In 1990, I briefly worked for a radiation

6    therapist who promised me that I was going to manage this

7    business office, and the job wasn't what it appeared to

8    be.  And I ended up leaving there at the first of 1990 in

9    hopes of starting my own consulting business.

10             I started having marital problems at that

11   time and so I -- because I was having a lot of conflicts

12   in my own home, I decided to work as a temp until I could

13   get things stable again.

14        Q.    And then -- you but it was April of '90 that

15   you went to work with FPA?

16        A.    That's right.  I took a temporary job through

17   Claims Overload and worked at MCA, and that assignment was

18   over within a couple of months, and I needed to work

19   somewhere.

20        Q.    When was your -- what was the date of your

21   automobile accident?

22        A.    Friday, July 13th, 1990.

23        Q.    So that was in the middle of your employment

24   with FPA, then?

25        A.    That's correct.

26        Q.    Can you -- there were several things said,

27   and I'm trying to kind of put a chronology on them for

28   myself just so I know what happened and when.

18

1        Apparently, it's shortly after that date,
2  July 13th of 1990 that Mr. Proulx came to your house for
3  the first time, right?
4        A.   Right.
5        Q.   So you're already divorced or at least
6  separated?
7        A.   Right.
8        Q.   And you're working at FPA?
9        A.   Right.
10       Q.   But at that point are you the manager yet or
11  not?
12       A.   It was the following week they made me the
13  manager.
14       Q.   All right.  So the first time you met with
15  him, all you did was talk about the accident pretty much?
16       A.   Well, yeah.
17       Q.   Was there something else?
18       A.   He was very flirtatious in that first visit.
19       Q.   Can you -- if you wish, could you tell me
20  about that?
21       A.   Well, he was just asking about my life and,
22  you know, I just remember him wanting coffee and just
23  telling me about himself and, you know, telling me things
24  that really had nothing to do with the auto accident.
25       Q.   Do you remember any of them?
26       A.   Not specifically, no.
27       Q.   Okay.  So, apparently, that meeting ended
28  amicably and he left?

19

1          A.      Yes.

2          Q.      All right.  Did you regularly pick up your

3     mail there?

4          A.      Yes.

5          Q.      Was there ever a time when somebody sent you

6     something there that you learned later you did not

7     receive?  In other words, somebody sent something and

8     said, "Gee, you know, Sara, I sent you something and you

9     never got it"?

10         A.      I rarely used that P.O. box and -- I rarely

11    used it, but when I would open the box, I would take out

12    what was in there.

13         Q.      Do you still have it?

14         A.      No, I don't.

15         Q.      When did you cease having it?

16         A.      Probably over a year ago, but I don't recall.

17         Q.      Probably sometime in 1996?

18         A.      Probably, but --

19         Q.      What did you do with it up until 1996?

20         A.      What do you mean what did I do with it?

21         Q.      What was its use?

22         A.      I set that up as a -- for a business I had at

23    one time, and I just kind of kept it open, but I never

24    used it for anything except for there were times where I

25    would send out fliers for a business that I had.

26         Q.      What business was that?

27         A.      I called it Accounts Retrievable.

28         Q.      What did it do?

64

1  A.  Basically, I -- I was try.ng to get business

2  to go into doctors' offices and review their records from

3  hospitals to see if they had done all the actual billing

4  through the hospital, because there's usually a

5  communication problem between the hospital services and

6  what goes on in the office.

7  Q.  And when did that business -- when did you

8  initiate that business?

9  A.  You know what?  I -- it was one of those

10  things I would start up and, you know, I -- I only did it

11  a couple of times, but, you know, it was just in the back

12  of my mind.  Gee, I really want to get that going again.

13  Q.  You had some fliers?

14  A.  Yeah.

15  Q.  Do you still have any of them?

16  A.  No.

17  Q.  Did they sort of explain what the business

18  did?

19  A.  Right.

20  Q.  They went out to doctors' offices?

21  A.  Right.

22  Q.  When did you first do that?

23  A.  '90 -- I don't recall.  In the early '90s.

24  Q.  Would that be, let's say, for example, before

25  your automobile accident?

26  A.  No, it was after.

27  Q.  Would it be before you started on this

28  lawsuit against FPA?

65

1        A.      That took a year of my life because I had to
2   wait in between surgeries.  Both of my hips were damaged
3   then.

4            I then moved to Chicago, and I worked as a
5   utilization review coordinator for Blue Shield and
6   MaxiCare for about a year.  And then I asked to be placed
7   in the billing department because I didn't feel
8   comfortable denying people care.

9            So I -- for about a year and a half, I
10  handled the billing aspects in this medical office, which
11  was called at the time Diversay Clinic.

12            I met my husband there, and we moved out to
13  California.

14       Q.      So you're out here about '87?

15       A.      Um-hum.  '87, '88, around there.

16       Q.      All right.

17       A.      And I was hired on at UCSD as a senior biller
18  for the lithotripsy center, and I handled a joint venture
19  between 30 urologists and the university.

20       Q.      And how long did that job last?

21       A.      A couple of years.

22       Q.      Full time?

23       A.      No, it was part time.  And I did consulting
24  work for a variety of urologists that were affiliated with
25  this joint venture.

26       Q.      What did you consult about?

27       A.      How to improve their reimbursement, billing
28  reimbursements, and I worked for an MRI site.  I worked

17